UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
------------------------------------------------------ x
                                                       :
JULIANNE E. TOOKER                                     :        3:16 CV 434 (RMS)
                                                       :
V.                                                     :
                                                       :
NANCY A. BERRYHILL[1],                                 :
ACTING COMMISSIONER OF                                 :
SOCIAL SECURITY                                        :        DATE: JUNE 28, 2018
                                                       :
------------------------------------------------------ x
```

RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff

Supplemental Security Income ["SSI"] and Social Security Disability Insurance ["SSDI"] benefits.

I.     ADMINISTRATIVE PROCEEDINGS

On or about April 13, 2012, the plaintiff filed applications for SSI and SSDI benefits

claiming that she has been disabled since October 17, 2009, due to "[c]hronic kidney issues,

chronic pain, [post-traumatic stress disorder], anxiety," and "shoulder, neck, back and leg issues

from numerous car [accidents]."  (Certified Transcript of Administrative Proceedings, dated May

19, 2016 ["Tr."] 253; *see* Tr. 224-39, 249-62).  The plaintiff's applications were denied initially

and upon reconsideration. (Tr. 66-89, 92-120, 144-51, 159-65; *see generally* Tr. 152-58, 271-84).

---

[1] At the time that the plaintiff commenced this action, Carolyn W. Colvin was the Acting Commissioner of Social
Security.  On January 21, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security, and is
replaced as the defendant in this action.  The Federal Vacancies Reform Act limits the time a position can be filled by
an acting official, 5 U.S.C. 3349(b); accordingly, as of November 17, 2017, Nancy Berryhill is serving as the Deputy
Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social
Security.

On December 16, 2013, the plaintiff requested a hearing before an Administrative Law Judge ["ALJ"] (Tr. 166-67; *see* Tr. 168-69, 188), and on April 17, 2015, a hearing was held before ALJ Brian Curley,[2] at which the plaintiff and a vocational expert, Larry Takki, testified. (Tr. 36-89; *see* Tr.189-223). On May 20, 2015, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 123-43). On May 27, 2015, the plaintiff requested review of the hearing decision (Tr. 12-13), and on January 13, 2016, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3; *see* Tr. 4-8).

On March 15, 2016, the plaintiff filed her complaint in this pending action (Doc. No. 1), and on May 25, 2016, the defendant filed her answer and certified administrative transcript, dated May 19, 2016. (Doc. No. 11). On June 13, 2016, this case was transferred to United States District Judge Robert N. Chatigny, absent consent to a Magistrate Judge. (Doc. No. 13). On August 25, 2016, the plaintiff filed the pending Motion to Reverse the Decision of the Commissioner, with brief in support (Doc. Nos. 16, 16-2 ["Pl.'s Mem."]; *see* Doc. Nos. 14-15), along with a Joint Statement of Material Facts (Doc. No. 16-1). On August 31, 2016, the defendant filed her Motion for Judgment on the Pleadings, with brief in support. (Doc. Nos. 17, 17-1 ["Def.'s Mem."]).

On March 31, 2017, this case was transferred to Senior United States District Judge Alfred V. Covello (Doc. No. 18), and on December 15, 2017, the parties consented to jurisdiction by a United States Magistrate Judge; the case was transferred to Magistrate Judge Sarah A. L. Merriam. (Doc. No. 33; *see* Doc. Nos. 19-21). Fourteen days later, on December 29, 2017, this case was transferred to Magistrate Judge Joan G. Margolis (Doc. No. 23), and on May 1, 2018, this case was transferred to this Magistrate Judge. (Doc. No. 24).

---

[2] The ALJ appeared by videoconference from Lawrence, Massachusetts; the plaintiff and the vocational expert appeared in Hartford, Connecticut. (*See* Tr. 15, 17, 19).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 16) is DENIED, and the defendant's Motion to Affirm (Doc. No. 17) is GRANTED.

## II.    FACTUAL BACKGROUND

As of her alleged onset date of disability, October 17, 2009, the plaintiff was thirty-two years old. (*See* Tr. 66). The plaintiff lives with her partner, and, at times, her adult son and her grandson. (Tr. 43).[3] The plaintiff has a twelfth grade education and does not have a driver's license; she is afraid to drive. (Tr. 24-25). She does not take public transportation because she panics when she is around other people; her psychiatrist approved her need for a medical livery service. (Tr. 46).

At the time of the hearing, the plaintiff weighed 133 pounds (Tr. 24, 33); previously, she weighed 200 pounds. (*See* Tr. 32). She attributed her weight loss to her depression, suppressed appetite, and medications. (Tr. 24). She has a history of cutting herself, and she had cut herself two weeks prior to her hearing. (Tr. 31-32). As discussed below, she has been treated by Dr. Lori Sobel for depression, her lack of desire to leave her house, suicidal thoughts, anxiety, bipolar disorder, and post-traumatic stress disorder ["PTSD"]. (Tr. 31-32; *see also* Tr. 154-55).

### A.    ACTIVITIES OF DAILY LIVING

The plaintiff watches some television but has difficulty focusing on shows lasting an hour. (Tr. 44). She does not have any hobbies although, in the past, she would ride a motorcycle, camp, fish, and walk. (Tr. 45). The plaintiff's partner does their grocery shopping and cooks, and the plaintiff "tr[ies]" to do some housecleaning, but her partner helps her with all of their household chores. (Tr. 42-43; *see* Tr. 153 (the plaintiff wants to shower, clean her house, and talk to others

---

[3] Sometimes when her son and grandson are with her, however, her son brings his baby to the plaintiff's parents' apartment downstairs when he knows that the plaintiff "need[s] . . . to be alone[.]" (Tr. 23-24, 35, 43).

but her mind tells her that others are talking about her)). At the time of her hearing, the plaintiff was attending a weekly women's support group at her church although sometimes she did not attend because of her depression or anxiety. (Tr. 45). When she is depressed, she does not shower for two or three days in a week. (Tr. 44).

The plaintiff testified that she has difficulty falling asleep, she has a lot of nightmares that cause her to wake in a panic, and she is tired during the day from getting less than four hours of sleep each night. (Tr. 33). Additionally, according to the plaintiff, it is very difficult for her to focus and concentrate on tasks, including on counseling sessions with Dr. Sobel (Tr. 33-34; *see also* Tr. 250 (SSA claims representative noted that the plaintiff had difficulty answering questions, was unable to focus, and was overly talkative)), and she feels angry when people speak to her. (Tr. 263, 266).

The plaintiff testified that she was being treated with Methadone for opiate dependence at the Connecticut Counseling Center; she became dependent on OxyContin which had been prescribed for pain from her kidney surgeries and for her back problems. (Tr. 38-39). However, the plaintiff has been "clean" for the past three years, with the exception of prescribed Benzodiazepines when she had her kidney surgeries. (Tr. 39-40). According to the plaintiff, she never felt that she was abusing drugs, but rather, was using them only as needed. (Tr. 51-52).

The plaintiff worked as a hostess at the Holiday Inn Express at the CoCo Key Resort; as a taxi driver; in the seafood department of Price Chopper; and as a school bus driver. [4] (Tr. 26-27).

---

[4] At the hearing, the vocational expert testified that an individual could perform the work of an office cleaner and price marker if such individual was limited to work at the light exertional level; could occasionally climb ramps and stairs but never ropes, ladders, or scaffolds; could occasionally balance, stoop, and crouch; had to avoid unprotected heights, dangerous equipment, vibrations, and the operation of a motor vehicle; was able to maintain concentration, persistence, and pace to carry out one to two step instructions; would need an environment that was slow oriented and not fast paced; could have occasional interaction with coworkers and supervisors but must avoid an occupation that involved working with the general public or working with crowds (crowds meaning five or more people); and could adapt to routine changes, set simple goals, and be aware of normal hazards (meaning boxes on the floor or a door that is ajar). (Tr. 58-59). Additionally, according to the vocational expert, an individual who could perform work at the light level

At the time of her hearing, the plaintiff was watching her two-year old nephew for three to five hours a week (Tr. 36-37), however, she testified that at times she cannot watch him because she is "very depressed, very nervous," and she does not think it would be "good for him in that state of mind." (Tr. 37).

B. <u>MEDICAL RECORDS</u>[5]

1. <u>DR. SOBEL</u>

The record reflects a long and consistent treatment history with Dr. Lori Sobel at Connecticut Counseling Centers. The plaintiff was initially evaluated by Dr. Sobel on December 21, 2010. (Tr. 995-96). The plaintiff's mental status examination revealed a history of depression and crying for the past year, decreased sleep, anxiety, panic attacks (shaking, shortness of breath) lasting a few minutes, flashbacks and nightmares, decreased concentration, compulsive behavior, feelings that she would be better off dead but no plans to harm herself, racing thoughts especially if she had a flashback, and irritability. (Tr. 996). She indicated the plaintiff's diagnoses were depression and PTSD, and she prescribed Vistaril and Zoloft. (Tr. 996). Thereafter, Dr. Sobel regularly saw the plaintiff for medication management.

---

of exertion, but could not maintain a regular schedule or sustain an ordinary routine without special supervision, could not work in coordination with others, or complete a normal workday and workweek without interruptions from psychologically based symptoms, could not accept instructions and respond appropriately to criticism, could not get along with coworkers or peers, could not respond to work changes and be aware of hazards and take precautions, could not travel within unfamiliar places or take public transportation and could not set realistic goals or make plans independently of others, would be precluded from all work. (Tr. 59-60).

[5] The following recitation is largely drawn from the parties thorough Joint Statement of Facts. (*See* Doc. No. 16-1). The plaintiff does not challenge the ALJ's conclusion as to the plaintiff's RFC to perform light work with some postural and environmental limitations. (Pl.'s Mem. at 2 n.1). Accordingly, although the Court has reviewed the entire administrative record, neither the parties, nor the Court, address the medical records pertaining to the plaintiff's treatment for her chronic kidney impairment and other physical conditions not otherwise referenced below. (Pl.'s Mem. at 2; *see generally* Tr. 318 (emergency room report of treatment after fall which occurred during a time period when she was working at CoCo Key Water Resort); Tr. 396-401, 421-47, 482-554, 556-94, 596-609, 611-71, 679-753, 755-852, 1034-40, 1106-11, 1147-87, 1223-70, 1278-86).

On March 11, 2011, the plaintiff reported that she felt no improvement with Zoloft and Vistaril; Dr. Sobel added Seroquel. (Tr. 380). The plaintiff described feeling very frustrated and depressed; she said that she had a panic attack in a supermarket. (Tr. 380). She also advised that she had no appetite and had lost twelve pounds. (Tr. 380). A month later, the plaintiff reported that she felt "awful[,]" and that she was moody; she went from being a raving lunatic to crying, sitting on her bed doing nothing, and banging her head against the wall. (Tr. 381). The plaintiff continued to complain of depression with irritability and racing thoughts; Dr. Sobel felt the plaintiff was at chronic risk to act impulsively, and she noted that the plaintiff "likely has Bipolar NOS . . .[, and] PTSD[.]" (Tr. 381). She discontinued the plaintiff's Vistaril and Seroquel and added Trazodone and Abilify. (Tr. 381). By May 20, 2011, the plaintiff had lost another seven pounds (Tr. 383), and she continued to complain of depression, decreased motivation, and crying. (Tr. 383). Dr. Sobel noted that, although the plaintiff continued to be "symptomatic[,] she . . . appear[ed] a little better." (Tr. 383). She increased her Trazodone and Zoloft dosages and started to taper her Lamictal prescription. (Tr. 383).

In July 2011, Dr. Sobel noted that the plaintiff appeared a little calmer, and she recommended Intensive Outpatient Treatment ["IOP"], but the plaintiff expressed a concern over a lack of transportation. (Tr. 384). At that time, the plaintiff's diagnoses were bipolar NOS (not otherwise specified), PTSD, and borderline personality traits. (Tr. 384). Dr. Sobel continued to prescribe Trazodone, Zoloft, Abilify, and Lamictal. (Tr. 384). On September 16, 2011, Dr. Sobel thought that the plaintiff appeared better emotionally, although the plaintiff reported that her mood was still up and down, she had decreased sleep, crying, and racing thoughts, and she felt depressed. (Tr. 385). Dr. Sobel added Ambien to the plaintiff's medication regimen. (Tr. 385).

On November 14, 2011, the plaintiff complained of decreased sleep, and although Ambien helped her fall asleep, she would wake because of pain, crying, or racing thoughts. (Tr. 387, 972). Dr. Sobel noted that the plaintiff appeared calmer and better, but the plaintiff reported that she still would have periodic thoughts of wishing she would not wake up, and urges to cut herself. (Tr. 387, 972). According to Dr. Sobel, the plaintiff was "not a reliable historian" because, although she filled her medications as prescribed, she did not pick up the refills, yet told Dr. Sobel that she was taking her medications compliantly. (Tr. 387, 972). Dr. Sobel increased the plaintiff's prescription for Trazodone for sleep and discontinued Lamictal. (Tr. 388, 973).

On January 23, 2012, the plaintiff returned to Dr. Sobel with continued complaints of panic attacks, feeling depressed and stressed, decreased sleep, racing thoughts, urges to cut herself, and feelings that she would be better off dead. (Tr. 389, 411, 968). Dr. Sobel thought that the plaintiff appeared "improved and calmer[,]" and Dr. Sobel noted again that the plaintiff was "an inconsistent and unreliable historian[,]" and that medication compliance "has been an issue in the past." (Tr. 389, 411, 968.). Her diagnoses remained bipolar disorder NOS, PTSD, and borderline personality traits, and Dr. Sobel added Neurontin to the plaintiff's medication regimen. (Tr. 389, 411, 968). A month later, the plaintiff reported ongoing panic attacks, depression, and stress. (Tr. 391, 413). Dr. Sobel increased the plaintiff's Trazodone dosage and repeated that the plaintiff was "an inconsistent and unreliable historian" and that medication compliance had been a problem in the past. (Tr. 391, 413).

The plaintiff returned on May 8, 2012; she continued to complain of panic attacks especially when she had to leave her house. (Tr. 393, 415, 958). Dr. Sobel noted, however, that the plaintiff appeared "improved and calmer." (Tr. 393, 415, 958). She continued the plaintiff on her same medications (Trazodone, Zoloft, Abilify, Ambien, and Neurontin). (Tr. 393, 415, 958).

On July 17, 2012, the plaintiff reported that she felt about the same although she was scattered and had problems focusing. (Tr. 941). Dr. Sobel added attention deficit disorder ["ADD"] to the plaintiff's diagnoses. (Tr. 941). Her medications remained the same. (Tr. 941.).

On September 25, 2012, the plaintiff reported that she felt about the same, but Dr. Sobel noted that she appeared "much brighter." (Tr. 933). The plaintiff had been able to stop the illicit use of Klonopin (Tr. 933); she continued to complain of panic attacks and depression, but did not appear as depressed and did not discuss wanting to hurt herself. (Tr. 933). According to Dr. Sobel, the plaintiff was "doing better and [was] less symptomatic both psychiatrically and physically." (Tr. 933). The plaintiff mentioned that she was focused on her daughter-in-law's baby shower, which helped to "organize her." (Tr. 933). Dr. Sobel stated that, in the past, the plaintiff had been an "inconsistent and unreliable historian" and that she had issues with medication compliance, but she appeared "better with this." (Tr. 933). A month later, Dr. Sobel noted that the plaintiff "continues to do about the best I have seen her." (Tr. 931). Dr. Sobel also noted that she was doing better with her medication compliance as well. (Tr. 931). Plaintiff continued to complain of depression, difficulty leaving the house, and panic attacks, but the panic attacks occurred less often, and she used behavioral techniques to lessen their intensity. (Tr. 931). Dr. Sobel added Concerta to the plaintiff's medication regimen. (Tr. 931).

On November 13, 2012, the plaintiff continued to complain of periodic triggered panic attacks, but they were occurring less often and were less intense. (Tr. 450, 929). She also complained of depression, difficulty leaving the house, and periodically thinking she would be better off dead. (Tr. 450, 929). Dr. Sobel opined that the plaintiff had "been doing better and [was] less symptomatic both psychiatrically and physically[,]" but "[m]edication compli[a]nce [was] still an issue." (Tr. 450, 929). She increased the plaintiff's prescription for Concerta. (Tr. 450, 929).

A month later, the plaintiff reported that she had not noticed a change on Concerta, but she might have been more irritable and had a bad panic attack with stress. (Tr. 451, 924). The plaintiff continued to do better, and Dr. Sobel advised her to monitor her irritability. (Tr. 451, 924).

On February 25, 2013, the plaintiff reported that the Concerta helped her to focus and be better organized. (Tr. 917). A mental status examination revealed the plaintiff's speech was fluent and her language was coherent, although she continued to complain of depression and crying, and she had difficulty leaving the house. (Tr. 917). She had no psychosis, but she ruminated on negative thoughts and had low self-esteem. (Tr. 917). Dr. Sobel opined that the plaintiff was doing better, but she still had "much stress" and continued to be symptomatic. (Tr. 917). Dr. Sobel increased her Zoloft prescription and told her to continue to monitor her irritability. (Tr. 917).

When the plaintiff returned on April 8, 2013, she reported that she was seeing her pastor on Sundays for counseling. (Tr. 913). According to the plaintiff, Concerta helped her focus, but she was more irritable. (*Id.*). On October 29, 2013, Dr. Sobel noted that she had not seen the plaintiff since April due to the plaintiff's hospitalizations for kidney problems and surgery. (Tr. 901; *see generally* Tr. 519-55, 611-854, 1034-1141). Following a phone call from the plaintiff, Dr. Sobel noted that she had not filled her prescriptions regularly; she ordered refills of prescriptions for Zoloft, Abilify, Ambien, Neurontin and Concerta, but did not refill Trazodone because the plaintiff had not filled that prescription since November 2012. (Tr. 901).

On November 19, 2013, the plaintiff returned to Dr. Sobel. (Tr. 893-94). She reported that she continued to be depressed and that she had been isolating more and spending less time with her grandson. (Tr. 893). Her diagnoses remained bipolar NOS, PTSD, ADD, and borderline personality traits. (Tr. 894). Dr. Sobel noted that the plaintiff was involved in a church group; she

recommended IOP and that the plaintiff engage in other outside activities. (Tr. 894). Dr. Sobol prescribed Vistaril in addition to the other medications the plaintiff was taking. (Tr. 894).

As of January 2014, the plaintiff reported that she continued to feel depressed; she was "bothered by finances and [was] going for disability." (Tr. 889). Her diagnoses and medication remained the same, and she continued to meet with a church group for support. (Tr. 890). On April 10, 2014, she reported to Dr. Sobel that she was compliant with her medication regimen and had used a pill box for the past few months. (Tr. 878). Dr. Sobel noted that the plaintiff was stable on her current medications but still had "much stress" and was "not asymptomatic." (Tr. 879). She was prescribed Prazosin in addition to her other seven medications. (Tr. 879). A month later, the plaintiff's diagnoses and medications remained the same except that Dr. Sobel increased the Prazosin dosage. (Tr. 875).

On June 24, 2014, the plaintiff continued to report feeling depressed and that she was stressed by her physical condition, family issues, finances and her efforts to obtain disability benefits. (Tr. 873). Her mental status examination, diagnoses and medication remained the same except Dr. Sobel increased the plaintiff's Abilify dosage. (Tr. 874). On August 12, 2014, the plaintiff reported increased stress due to the fact that her grandson's mother moved with her grandson to another town. (Tr. 870). Her mental status examination and diagnoses remained the same, and Dr. Sobel discontinued Prazosin. (Tr. 870). On October 7, 2014, the plaintiff reported that she was bothered by issues involving the custody of her grandson, and she reported that Concerta was not working; she was feeling too scattered and was bothered by her lack of concentration. (Tr. 867). She admitted cutting herself superficially to help relieve stress. (Tr. 867). Her mental status examination and diagnoses remained the same. (Tr. 867).

A month later, Dr. Sobel increased the plaintiff's Adderall dosage after she complained that the current dosage was not helping her concentrate. (Tr. 865). At the same time, a mental status examination revealed that her speech was fluent, her language was coherent and she was oriented times three.[6] (Tr. 865). As of December 18, 2014, the plaintiff reported her focus improved on the higher dosage of Adderall though she had a slight increase in her irritability. (Tr. 859). She continued her involvement with her church support group, and she reported that she was watching her two-year-old nephew and cared for her grandson each week from Thursday to Sunday. (Tr. 859-60). She appeared "better," which Dr. Sobel attributed to the fact that the plaintiff was "getting more money, [had] less stress at home and [had an] increase in Adderall." (Tr. 861-62).

On February 26, 2015, the plaintiff reported that she was more depressed, and her social situation had not regressed as she had issues getting along with her mother again. (Tr. 855). The plaintiff appreciated the extra income she received from watching her nephew, and she still watched her grandson four days each week. (Tr. 855). Additionally, she was involved in her church support group. (Tr. 856). Her mental status examination revealed fluent speech, coherent language, orientation times three, and no psychosis. (Tr. 855). She reported that she was more depressed with social stressors, had chronic low self-esteem, was fighting urges to cut herself, and still had nightmares and flashbacks of her childhood rapes. (Tr. 856). Dr. Sobel noted that the plaintiff had very little social life, limited coping skills, serious medical problems and a personality disorder, so medication could only do "so much." (Tr. 856).

---

[6] Oriented times three means alert and oriented as to person, place and time.

## 2. COMMUNITY HEALTH CENTER

In addition to the treatment that the plaintiff received from her treating psychiatrist, she received behavioral health treatment at Community Health Center from April 7, 2008 to February 18, 2015. In April 2008, the plaintiff was evaluated for Methadone treatment by Dr. Mark Kraus, the Medical Director at Connecticut Counseling Centers. (Tr. 1028-32). She reported a history of using opiates/analgesics for seven years (Tr. 1029), and she admitted to using 360-800 milligrams of non-prescribed OxyContin per day. (Tr. 1029). She stated that she had a history of emotional, physical, and sexual abuse by close friends. (Tr. 1031). She suffered emotional, physical, and sexual trauma at the age of seven by a close friend of the family and was having trouble addressing her PTSD. (Tr. 1031). The plaintiff acknowledged that she had experienced serious depression not related to substance or alcohol abuse, and psychiatric follow-up was recommended for the depression. (Tr. 1031). Dr. Kraus diagnosed the plaintiff with opioid-type dependence. (Tr. 1032). He recommended long term outpatient Methadone maintenance, and he assigned the plaintiff a Global Assessment of Functioning ["GAF"] score of 54. (Tr. 1032).

Counseling notes begin in January 2009 and continue through February 2015. In 2009, the notes showed that the plaintiff was oriented (Tr. 1013-14, 1016-17, 1019-20, 1023, 1025-27), did not appear to have a thought disorder (Tr. 1017, 1023, 1025-27), was attentive (Tr. 1017, 1020, 1023, 1025-27), did not appear to be under the influence of illicit substances (Tr. 1013-14, 1018, 1022-23, 1025-27), had a Benzodiazepine in her urine, which she claimed was from taking Benadryl (Tr. 1021), and appeared hyper and verbose. (Tr. 1020).

Counseling notes in 2010 showed that the plaintiff was oriented, had no signs of withdrawal (Tr. 997, 999-1010), and had a brighter affect. (Tr. 1004, 1006). But she reported increased depression including crying daily, pervasive thought patterns, feelings of helpless/hopeless, and

some passive suicidal ideation. (Tr. 1008; *see also* Tr. 1007, 1009). She had decreased sleep and felt overwhelmed (Tr. 1005); she experienced panic attacks (Tr. 999); and her depression and anxiety waxed and waned. (Tr. 1004). On November 17, 2010, the plaintiff admitted to using a Benzodiazepine when she found out her son's girlfriend was pregnant. (Tr. 999; *see also* Tr. 971, 975, 997).

In 2011, the counseling notes showed the plaintiff was oriented and had no signs of withdrawal or intoxication. (Tr. 974, 978, 980, 982, 985, 989-90, 992, 994). The plaintiff was attentive (Tr. 992), presented with a brighter affect (Tr. 975, 978), and had good hygiene and eye contact. (Tr. 975-76). The plaintiff reported that she felt she was not making any progress in her depression (Tr. 989); she had increased stress (Tr. 985); and she had lost fifteen pounds because she had no appetite. (Tr. 990; *see also* Tr. 974, 976, 982, 985).

On January 10, 2012, the plaintiff was seen at Community Health Center by Brooke Carson, Psy.D., who was working under the supervision of R.T. Kearney, Ph.D.[7] (Tr. 366-67). Dr. Carson noted that the plaintiff had a depressed mood and a constricted affect, her thought process and judgment were intact, and her insight was minimally impaired. (Tr. 366). The plaintiff reported experiencing severe panic attacks and disturbing nightmares that occurred a couple times each week. (Tr. 366). Dr. Carson diagnosed the plaintiff with major depression, recurrent moderate and PTSD, and she assigned a GAF score of 50. (Tr. 367). On January 17 and February 6, 2012, Dr. Carson reported the same clinical psychiatric signs, diagnoses and GAF score. (Tr. 362-65).[8]

---

[7] Although the progress notes of the appointments at the Community Health Center bear the names of different providers, the underlying records indicate that plaintiff was seen at each appointment by Dr. Carson "[u]nder the [s]upervision of: Timothy Kearney, Ph.D." (See, *e.g.*, Tr. 362, 364, 366).

[8] Bruce Stevens, APRN evaluated the plaintiff on February 7, 2012. (Tr. 359-61). The plaintiff reported re-experiencing traumatic events, nightmares, flashbacks, and psychological stress related to her being raped, and frequent dreams of being raped, getting killed, or killing herself. (Tr. 359). She also reported symptoms of depression

From January to May 2012, the plaintiff's counseling notes reflect that she was alert, focused, and appropriately dressed (Tr. 957, 960-63, 966, 970), that she had a bright affect and no acute signs of depression or anxiety (Tr. 970; *see* Tr. 974-75), and that she appeared motivated for recovery. (Tr. 960-963; *see* Tr. 957). However, the plaintiff also reported that she was stressed, overwhelmed, and weepy (Tr. 967); she complained of being depressed and experiencing intermittent panic attacks (Tr. 956); and she was referred to IOP to address her illicit use of Benzodiazepines for stress. (Tr. 956; *see* Tr. 957).

The plaintiff participated in the IOP from June to July 2012. (Tr. 937-44, 946-49, 951-55). She appeared oriented and appropriately dressed (Tr. 937, 939, 943-45, 947, 949, 951-955); she identified her stressors (Tr. 954; *see also* Tr. 954), and she admitted taking Klonopin to ease her withdrawal symptoms. (Tr. 947).

Counseling notes from August to December 2012 reflect that the plaintiff was oriented, alert, well dressed and groomed (Tr. 923, 925-28, 930, 932, 934-35); she had problems with irritability and sleeping (Tr. 926). Progress notes in 2013 revealed the plaintiff was alert and oriented (Tr. 892, 895, 897, 900, 903, 909, 916, 919, 922); she did not appear to be using drugs, and denied using illicit substances. (Tr. 892, 895, 897, 909, 911-12, 915, 919, 922). During a November 15, 2013 session, the plaintiff informed her therapist that she had been painting her house recently and was feeling sore. (Tr. 895).

The plaintiff's progress notes in 2014 continued to highlight treatment for her kidney impairment (Tr. 880-81, 883-86, 888), and notes from 2014 through February 2015 indicated the

---

(insomnia, sad mood, appetite disturbance, irritability, and anhedonia), and anxiety (excessive worrying, increased heart rate or palpitations, chest pain/discomfort, and agoraphobia). (Tr. 360). A mental status examination showed a constricted affect, appropriate eye contact, an anxious and depressed mood, normal speech, intact thought process and memory, and no disturbances of perception. (Tr. 359). He noted the plaintiff's diagnoses as major depression, recurrent moderate and PTSD and he assigned a GAF score of 50. (Tr. 361).

plaintiff was alert, oriented, and well groomed (Tr. 857-58, 863-64, 868, 872, 877, 880-81, 884, 886-88); she did not appear to be under the influence of illicit substances (Tr. 858, 868-69, 872, 877, 881, 887-88).[9]

## III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings

---

[9] On October 15, 2014, Philip Patros, Ph.D., completed a form for the Department of Social Services (*see* Tr. 1288-89) in which he determined that the plaintiff did not have the mental capacity to perform unskilled work activity and, thus, she was disabled and eligible for state administered general assistance. (Tr. 1288-89).

are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

## IV.  DISCUSSION

### A.  THE ALJ'S DECISION

Following the five step evaluation process,[10] the ALJ found that plaintiff's date last insured was September 30, 2011 (Tr. 128), and that she has not engaged in substantial gainful activity since October 17, 2009, the alleged onset date. (*Id.*, citing 20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*). The ALJ concluded that the plaintiff has the severe impairments of pyelonephritis, degenerative disc disease of the lumbar and cervical spine, bipolar disorder, PTSD, attention deficit disorder ["ADD"], borderline personality disorder and a history of substance abuse (Tr. 128-30, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)), but that the plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 130-31, citing 20 C.F.R. §§

---

[10] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo*, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  At step four, the ALJ found

that the plaintiff had the residual functional capacity ["RFC"] to perform light work as defined in

20 C.F.R. §§ 404.1567(b) and 416.967(b) except that she can occasionally climb ramps and stairs;

never climb ladder, ropes, or scaffolds; occasionally stoop, balance, and crouch; and must avoid

unprotected heights, dangerous equipment, vibrations, and operation of a motor vehicle.  (Tr.

131).[11]  Additionally, the ALJ concluded that the plaintiff is able to maintain concentration,

persistence or pace on one-to-two step instructions, work in an environment that is goal oriented

and free of fast-paced production, and perform work involving only simple work-related decisions

with few, if any, workplace changes.  (Tr. 131). The ALJ also concluded that the plaintiff is able

to have occasional interaction with coworkers and supervisors but must avoid working with the

public and crowds of more than five people. (Tr. 131). She is also able to adapt to routine changes

in the work setting, set simple goals, be aware of hazards, and take appropriate safety precautions.

(Tr. 131).  Finally, the ALJ found that the plaintiff was not capable of performing any past relevant

work (Tr. 136, citing 20 C.F.R. §§ 404.1565 and 416.965), but that, considering her age, education,

work experience, and RFC, she could perform the work of an office cleaner and a price marker.

(Tr. 136-37, citing 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).  Accordingly,

the ALJ concluded that plaintiff was not under a disability between the alleged onset date of

October 17, 2009 through the date of his decision. (Tr. 137, citing 20 C.F.R. §§ 404.1520(g) and

416.920(g)).

    B.    <u>THE PLAINTIFF'S CLAIMS ON REVIEW</u>

    Here, the plaintiff contends that the ALJ failed to evaluate fairly and properly the opinions

of her treating psychiatrist, Dr. Sobel (Pl's Mem. at 2-18), and that the ALJ's credibility

---

[11] *See* note 4 *supra* (detailing the testimony of the vocational expert).

determination and RFC finding were not supported by substantial evidence as they were tainted by his failure to analyze fairly and properly the opinions of the treating psychiatrist.[12] (Pl.'s Mem. at 19). The defendant asserts that the ALJ properly weighed the medical opinions, including those from Dr. Sobel, when he assessed the plaintiff's mental RFC (Def.'s Mem. at 2-17), and that the ALJ's RFC and credibility findings are not tainted by an improper evaluation of Dr. Sobel's opinion. (Def.'s Mem. at 17-18).

### C. THE TREATING PHYSICIAN RULE

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess,* 537 F.3d at 128, (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]); *see* 20 C.F.R. § 416.927(c)(2). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Once the ALJ has considered these factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) ("We will always give good reasons in our

---

[12] The plaintiff makes this second argument in one paragraph of her nineteen-page memorandum. In essence, the claim is simply an extension of the argument she sets forth at pages five through eighteen of the memorandum, *i.e.* that the ALJ failed "fairly and properly evaluate the opinion of the plaintiff's treating psychiatrist . . . ." Pl.'s Mem. at 2.

notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion."). In this case, the ALJ did just that.

In his decision, the ALJ acknowledged the plaintiff's "longstanding" treatment history with Dr. Sobel, the plaintiff's treating psychiatrist. (Tr. 135); *see* 20 C.F.R. §§ 404.1527(c) and 416.927(c). Specifically, the ALJ noted that Dr. Sobel "showed longitudinal treatment with methadone, for pain according to the claimant, [and] for opiate dependence according to [Dr. Kraus] and others." (Tr. 132). The ALJ continued, "[T]here were few, if any, significant mental status examinations or physical examinations, from Dr. Sobel or Liordany Mantani, which would support the allegedly disabling functioning of the claimant." (Tr. 133). The ALJ correctly concluded that "[i]n terms of mental health, the medical record failed to provide sufficient evidence overall to support limitations greater than the residual functional capacity." (Tr. 132). Ultimately, the ALJ assigned "limited weight" to Dr. Sobel's opinions noting the internal inconsistencies among Dr. Sobel's four opinions, and the fact that the underlying treatment records "generally reflected subjective complaints and little significant objective evidence to support those complaints." (Tr. 135).

While the plaintiff's statements about her symptoms are to be considered by the ALJ, statements "about . . . symptoms will not alone establish that [a claimant] is disabled." 20 C.F.R. §§ 404.1529(a) and 416.929(a). "There must be objective medical evidence from an acceptable medical source that shows . . . a medical impairment(s) which could reasonably be expected to produce the . . . symptoms alleged[.]" *Id.* Moreover, "[t]he determination of mental RFC involves the consideration of evidence, such as: . . . [h]istory, findings, and observations from medical sources (including psychological test results)[,]" and the

> [r]eports from psychiatrists and other physicians, . . . and other professionals working in the field of mental health should contain the individual's medical

> history, mental status evaluation, psychological testing, diagnoses, treatment prescribed and response, prognosis, a description of the individual's daily activities, and a medical assessment describing ability to do work-related activities.

Social Security Ruling ["SSR"] 85-16, 1985 WL 56855, at *2-3 (S.S.A. 1985).

In this case, the ALJ considered the voluminous treatment records from Dr. Sobel. In doing so, the ALJ appropriately noted that in her underlying treatment records, Dr. Sobel "seemed to accept, uncritically as true, most, if not all, of what the claimant reported," yet, "there exist good reasons for questioning the reliability of the claimant's subjective complaints." (Tr. 135). The records repeatedly reflect the plaintiff's reports of, *inter alia*, feeling depressed and anxious, having panic attacks, flashbacks and nightmares, and feeling like she would be better off not being here. Often in those same records, however, Dr. Sobel opined that plaintiff looked "a little better[]" (Tr. 383); appeared better (Tr. 385; *see also* Tr. 917); "appeared emotionally calmer and better[]" (Tr. 387, 972); appeared "improved and calmer[]" (Tr. 393, 415, 958); appeared "much brighter[]" (Tr. 933); did not appear as depressed (Tr. 933); "continue[d] to do the best [Dr. Sobel had] seen [the plaintiff[]]" (Tr. 931); and, was "doing better and [was] less symptomatic both psychiatrically and physically." (Tr. 450, 929). Dr. Sobel would openly refer to the plaintiff as "an inconsistent and unreliable historian." (Tr. 933). Additionally, the records reflect that, although the plaintiff reported that she had decreased concentration and felt "scattered" (*see* Tr. 865, 867, 941, 996), there were no objective medical tests to substantiate such reports, and Dr. Sobel noted that the plaintiff's focus improved with medication (*see* Tr. 859, 861-62, 913, 917), and when she had family responsibilities and other events in her life on which to focus. (*See* Tr. 933).

Additionally, consistent with Dr. Sobel's notes, Dr. Kraus frequently found the plaintiff to be attentive, focused and oriented. *See* Section II.B.2. *supra*. Similarly, Dr. Carson, who conducted a mental status examination of the plaintiff, found that she had a depressed mood and a constricted

affect, but her thought process and judgment were intact, her insight was minimally impaired, she was oriented, and she had normal speech. (Tr. 366). Additionally, in the January 2014 evaluation of the plaintiff at the UConn Health Center, Dr. Gjerston noted that the plaintiff's psychiatric status was normal; she was oriented to time, place, and person; and she had an appropriate mood and affect. (Tr. 529; *see also* Tr. 535, 614, 624, 632).

Similar conclusions were reached by Dr. Yacov Kogan, the consultative examiner. (Tr. 470-74). On October 9, 2013, Dr. Kogan performed a brief mental status examination in which he found the plaintiff alert and oriented, with normal expressive and receptive language; she was able to recall her date of birth and social security number; she was able to register three out of three objects and recall these same objects after three minutes; she had a six-digit forward memory span, a constricted affect, no pressured speech, and her thought process was organized. (Tr. 471-72). Dr. Kogan concluded that the mental status examination revealed that the plaintiff retained a preserved level of consciousness, language, memory and concentration. (Tr. 472). He opined that the plaintiff's work-related activities involving speaking, comprehending, remembering and carrying out instructions were not limited. (Tr. 472-73). The ALJ appropriately relied on Dr. Kogan's findings, *see* 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3) ("The more a medical source presents evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."), and these findings are consistent with Dr. Sobel's underlying treatment records.

The ALJ also appropriately noted the inconsistencies in Dr. Sobel's assessments. (*See* Tr. 135). In Dr. Sobel's first assessment, dated June 8, 2012, she diagnosed plaintiff with bipolar disorder, NOS, PTSD, opiate dependence, Benzodiazepine abuse, and borderline personality traits.

(Tr. 405).[13] She stated the plaintiff was stable on Methadone maintenance but periodically took non-prescribed Benzodiazepines, and was taking Methadone, Trazodone, Neurontin, Ambien, Abilify, and Zoloft; she noted that the plaintiff was an unreliable historian regarding medication compliance. (Tr. 405). Dr. Sobel noted that the plaintiff's appearance was disheveled, she had a depressed mood, and she had limited judgment and insight. (Tr. 405-06).

With regard to functional abilities, Dr. Sobel opined the plaintiff had a serious problem taking care of personal hygiene and only a slight problem in caring for physical needs (*e.g.* dressing and eating). (Tr. 406). However, in an undated assessment from Dr. Sobel,[14] she opined that the plaintiff had no problem taking care of personal hygiene. (Tr. 375). Similarly, in January 2013, Dr. Sobel opined that the plaintiff had no problem taking care of hygiene and caring for her physical needs. (Tr. 457).[15] Additionally, in July 2014,[16] Dr. Sobel completed a medical report

---

[13] In June 2012, Dr. Sobel noted that the plaintiff had serious problems interacting appropriately with others in a work environment and respecting/responding appropriately to others in authority (Tr. 406), a very serious problem handling frustration appropriately (Tr. 406), and an obvious problem getting along with others without distracting them or exhibiting behavioral extremes. (Tr. 407). Dr. Sobel opined that the plaintiff would have significant problems focusing long enough to finish assigned simple activities or tasks and performing basic work activities at a reasonable pace/finishing on time, and would find it very difficult to carry out multi-step instructions and perform work activity on a sustained basis (eight hours each day, five days per week). (Tr. 407).

[14] In the undated assessment from Dr. Sobel, she noted, just as she had in the June 2012 assessment, that, as of the time the assessment was completed, she had last seen plaintiff on May 8, 2012. (Tr. 374). Much of the undated assessment is illegible. (*See* Tr. 374-77).

[15] In an assessment completed on January 22, 2013, Dr. Sobel opined the plaintiff had a serious problem using appropriate skills to meet ordinary demands of a work environment and very serious problems handling frustration appropriately; she stated that the plaintiff responded poorly to stress by getting angry. (Tr. 456). She stated the plaintiff responded poorly to stress by getting angry or depressed. (Tr. 457). Dr. Sobel also concluded, as she had in June 2012, that the plaintiff had a slight problem asking questions or requesting assistance (Tr. 407, 457) and carrying out single-step instructions (Tr. 407, 457). In January 2013, Dr. Sobel opined that the plaintiff had a slight problem getting along with others without distracting them, had obvious problems interacting appropriately with others in a work environment and respecting/responding appropriately to others in authority, and that the plaintiff did not get along with people and tended to isolate herself. (Tr. 457). According to Dr. Sobel, the plaintiff had no problem using good judgment regarding safety and changing from one simple task to another (Tr. 457), but had obvious problems carrying out multi-step instructions and focusing long enough to finish assigned simple activities or tasks, and serious problems performing basic work activities at a reasonable pace/finishing on time and performing work activity on a sustained basis (eight hours each day, five days per week). (Tr. 457).

[16] In that report, Dr. Sobel stated the plaintiff was depressed and irritable and had severe anxiety, poor coping skills, and a lack of concentration. (Tr. 1291). Dr. Sobel opined that the plaintiff was markedly limited in her ability to

for the Department of Social Services in connection with the plaintiff's application for a state disability program. (Tr. 1290-98). As the ALJ noted, in that report, Dr. Sobel opined that the plaintiff had moderate limitations in maintaining attention and concentration, performing within a schedule, interacting appropriately with the public, responding appropriately to supervisors and traveling in unfamiliar places or using public transportation. (Tr. 1290-98). Two months later, however, in a Mental Residual Functional Capacity Questionnaire completed on behalf of the plaintiff in connection with her underlying application for benefits, Dr. Sobel considered the plaintiff to be seriously limited, unable to meet competitive work standards, or very seriously limited in many of these areas. (*See* Tr. 674-78).[17] The ALJ concluded that the plaintiff does

---

[17] understand, remember, and carry out detailed instructions. (Tr. 1295). She was moderately limited (defined as capacity to perform the activity is diminished) in the following domains of mental functioning: maintaining attention and concentration for extended periods; performing activities within a schedule; maintaining regular attendance; being punctual within customary tolerances; completing a normal workday/workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; and traveling in unfamiliar places or using public transportation. (Tr. 1295-96). Dr. Sobel opined that the plaintiff was not significantly limited in understanding, remembering, and carrying out very short, simple instructions; sustaining ordinary routine without special supervision; working in coordination or proximity with others; making simple work-related decisions; getting along with coworkers without distracting them; maintaining socially appropriate behavior; and setting realistic goals. (Tr. 1295-96).

[17] In the September 2, 2014 Mental Residual Functional Capacity Questionnaire (*see* Tr. 674-78), Dr. Sobel indicated that the plaintiff's signs and symptoms included the following: anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, impairment in impulse control, generalized persistent anxiety, mood disturbances, difficulty thinking or concentrating, recurrent and intrusive recollections of a traumatic experience which are a source of marked distress, emotional withdrawal or isolation, intense and unstable relationships and impulsive and damaging behavior, motor tension, and sleep disturbance (Tr. 675). Dr. Sobel opined that the plaintiff was unable to meet competitive work standards (defined as not being able to satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting) in the following domains: maintaining regular attendance and punctuality within customary, usually strict tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; and dealing with normal work stress. (Tr. 676). According to Dr. Sobel, the plaintiff was seriously limited but not precluded in the following areas: maintaining attention for two hour segments; accepting instructions and responding appropriately to criticism from supervisors; and getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (Tr. 676). She opined that the plaintiff is unable to understand and remember detailed instructions, carry out detailed instructions, and deal with stress of semi-skilled and skilled work in a work setting. (Tr. 677). Additionally, the plaintiff was seriously limited but not precluded from interacting appropriately with the general public, maintaining socially appropriate behavior, traveling in unfamiliar places, and using public transportation. (Tr. 677). Dr. Sobel stated that the plaintiff had limited, but satisfactory ability in other work-related areas, including remembering work-like procedures, understanding and remembering short and simple

have some restrictions. He accounted for those in his RFC assessment by limiting the plaintiff to a work environment in which she is exposed to one-to-two step instructions, where the "work environment . . . is goal oriented free of fast-paced production; involving only simple work-related decisions; with few, if any workplace changes[,]" and where, "[s]ocially, the claimant is able to have occasional interaction with coworkers and supervisors but must avoid working with the public and crowds defined as more than 5 people."  (Tr. 131). However, the ALJ did not find support for the severity of some of the restrictions listed in a few of Dr. Sobel's assessments.

In addition to noting the inconsistencies in Dr. Sobel's assessments, the ALJ noted that, although the plaintiff reported that, when she is depressed, she does not shower for two or three days in a week (Tr. 44), notes from the visiting nurse service described the plaintiff as independent in bathing, showering and personal care. (*See* Tr. 681). Moreover, treatment notes from the plaintiff's counseling sessions reflect that she was regularly well-dressed and groomed.  (*See* Tr. 1017, 1019-20, 1023, 1025-27 (2009 treatment records); *see* Tr. 923, 925-928, 930, 932, 934-35 (2012 treatment records); *see* Tr.  857-58, 863-64, 868, 872, 877, 880-81, 884, 886-88, 892, 895, 897, 900, 903, 909, 916, 919, 922 (2013-14 treatment records).

The ALJ also accurately considered Dr. Sobel's opinions in November 2011, February 2012 and May 2012, that the plaintiff was "not a reliable historian[,]" and that she was an "inconsistent and unreliable historian." (Tr. 387, 389, 393, 411, 415, 933, 941, 958, 968, 972); *see* SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996)[18] ("In determining the credibility of the

---

instructions, sustaining ordinary routine without special supervision, responding appropriately to changes in a routine work setting, and working in coordination or proximity to others. (Tr. 676).

[18] SSR 96-7p was rescinded and superseded by SSR 16-3p on October 25, 2017. SSR 16-3p, 2017 WL 5180304, at *1 (S.S.A. Oct. 25, 2017). As stated in SSR 16-3p, ALJs apply 16-3p in decisions made on or after March 28, 2016, and "[w]hen a Federal court reviews our final decision in a claim, we also explain that we expect the court to review the final decision using the rules that were in effect at the time we issued the decision under review."  *Id.* The decision in this case was issued on May 20, 2015; accordingly, SSR 96-7p applies.

individual's statements, the adjudicator must consider the entire case record, including . . . statements and other information provided by treating or examining physicians or psychologists . . . ."). Additionally, the ALJ properly considered the entries in Dr. Sobel's treatment records that the plaintiff had a history of non-compliance with her prescribed medication, and that she tended to "undertake" her medication. (Tr. 387, 391, 393, 413, 415, 450, 455,[19] 958, 972); *see* SSR 96-7p, 1996 WL 374186, at *7 ("the individual's statements may be less credible if the . . . medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure[]").

The ALJ also noted that the plaintiff's activities of daily living "make the subjective complaints of the claimant less credible." (Tr. 134). The ALJ correctly observed that "[the plaintiff] remodeled her home and painted some part of her house at various times during the period at issue[,]" and that she held part-time jobs and continued to look for work. (Tr. 134-35; *see* Tr. 318, 895, 1000, 1016, 1018). The underlying treatment records also reflect the plaintiff's involvement in social activities, which the ALJ appropriately considered. (*See* Tr. 863 (taking care of her nephew and grandson on a regular basis), 881 (spending time with grandson, friend and mother); Tr. 947 (going on family camping trip for a weekend in July 2012)).

Conversely, the ALJ concluded that the opinions of the State agency psychological consultants were entitled to "significant weight[]" as they were "well supported with specific references to medical evidence[,]" and were "internally consistent as well as consistent with the evidence as a whole." (Tr. 136). The Second Circuit has recognized that "[t]he opinions of non-

---

[19] In her January 22, 2013 assessment, Dr. Sobel noted the plaintiff's diagnoses as bipolar disorder, PTSD, ADD, a borderline personality disorder, and opiate dependence (on Methadone). (Tr. 455). She also indicated that the plaintiff was supposed to be taking Concerta, Methadone, Zoloft, Abilify, Trazodone, Ambien, and Neurontin, but that she tended to "undertake" her medication. (Tr. 455).

examining medical personnel cannot, in themselves and in most situations, constitute substantial evidence to override the opinion of a treating source." *Schisler v. Sullivan*, 3 F.3d 563, 570 (2d Cir. 1993). However, the opinions of non-examining sources may "override treating sources' opinions, provided they are supported by evidence in the record." *Id.* (citing 20 C.F.R. §§ 404.1527(f) and 416.927(f)). Thus, if the ALJ concludes that the opinion of a non-examining source is entitled to greater weight than the opinion of a treating physician, the ALJ must set forth "'good reasons' for not crediting the opinion" of the treating physician. *Burgess*, 537 F.3d at 129-30 (quoting *Snell,* 177 F.3d at 133); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

On July 20, 2012, Deborah Stack, Ph.D., a non-examining consultative psychologist (*see* Tr. 72-77, 84-89), assessed the plaintiff's anxiety disorder. Dr. Stack concluded that the plaintiff has mild restrictions in activities of daily living, and moderate difficulties in social functioning and in maintaining concentration, persistence or pace. (Tr. 72, 84). She noted that the plaintiff's concentration, pace and sustainability were impaired secondary to affective symptoms, her ability to carry out complex directives was entirely compromised, and her pace was hindered by diminished concentration, but her ability to carry out simple directives was intact. (Tr. 74, 86). According to Dr. Stack, the plaintiff was sometimes disheveled, and because of mood symptoms and her personality disorder, she would do best in a non-public work environment in which contact with others was superficial and infrequent, and the need for collaboration was not required. (Tr. 75, 87). Dr. Stack found the plaintiff moderately limited in her ability to interact with the general public, ask simple questions, and accept instructions and respond appropriately to criticism, such that on occasion, she might react poorly to criticism from supervisors. (Tr. 74-75, 87). Dr. Stack

indicated the plaintiff would have difficulty with abrupt, frequent changes in work routine but could adapt to minor changes (Tr. 75, 87), and she would need assistance setting goals when initially getting acclimated to a new task. (*Id.*).

On April 5, 2013, Kelly Rogers, Ph.D., a consultative non-examining psychologist (*see* Tr. 101-05, 117-18), concluded that the plaintiff's severe impairments included anxiety, affective disorder, ADD/ADHD, and personality disorder. (Tr. 101, 117). She stated that these impairments resulted in mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 102). Dr. Rogers opined the plaintiff's low mood, lability, anxiety, and intrusive thoughts detracted from sustained, consistent focus (Tr. 104), and her low mood, anxiety, and poor frustration tolerance created some lack of persistence. (Tr. 104). According to Dr. Rogers, these effects were greater for tasks that were complex or variable in nature, and, though the plaintiff was able to repeatedly execute familiar work of one or two elements for periods of two hours or more over the course of a normal work week, she was not ideally suited to work settings with strict time/production requirements. (Tr. 104). Dr. Rogers stated that, although the plaintiff could work with others, her "[l]ow mood, anxiety and characterological disturbance detract from interaction with the general public and can complicate her response to authority figures." (Tr. 105). According to Dr. Rogers, the plaintiff would respond appropriately to task-specific direction; she would have difficulty with abrupt, frequent changes in work routine but could adapt to minor changes; she would need assistance setting goals when initially getting acclimated to a new task; and she would be aware of hazards and would be able to arrange transportation for work. (Tr. 105).

In his decision, the ALJ explained that he assigned the opinions of the State agency psychological consultants significant weight because they are "well supported with specific

references to medical evidence[,]" they are "internally consistent as well as consistent with the evidence as a whole[,]" and "there is little objective evidence contradicting these findings[.]" (Tr. 136). Additionally, although the plaintiff argues that the ALJ erred in relying on these opinions as they were completed without the benefit of records dated after April 2013 (Pl.'s Mem. at 17), the plaintiff's treatment records post-dating Dr. Rogers's assessment, as they are discussed above, do not reflect a deterioration in plaintiff's condition. Accordingly, the ALJ did not err in his treatment of the plaintiff's treating psychiatrist's opinions, and he adequately explained the weight he assigned to the opinions of the State agency psychological consultants. Moreover, the ALJ's credibility determination and RFC finding were supported by substantial evidence and were not tainted by any alleged failure to analyze fairly the treating psychiatrist's opinions.

V.      CONCLUSION

Accordingly, for the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 16) is DENIED, and the defendant's Motion to Affirm (Doc. No. 17) is GRANTED.

Dated this 28th day of June, 2018 at New Haven, Connecticut.

/s/ Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge